## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TIFFANY WILSON and MICHAEL BROFMAN, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MASTERCARD INC., and MASTERCARD INTERNATIONAL INC.,**<br><br>**Defendants.** | **Civil Action No. _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 2

THE PARTIES.................................................................................................................... 7

    A.    Defendants ..................................................................................... 7

    B.    Plaintiffs ......................................................................................... 8

FACTUAL ALLEGATIONS ........................................................................................... 9

    A.    Overview of the Payment Card Foreign Exchange Market .................... 9

    B.    Applicable Contractual Provisions ....................................................... 12

    C.    Mastercard Imposed Inflated Foreign Exchange Rates in Violation of the Mastercard Rules ............................................................................... 13

CLASS ACTION ALLEGATIONS ............................................................................... 15

CLAIMS FOR RELIEF ................................................................................................... 17

PRAYER FOR RELIEF .................................................................................................. 19

DEMAND FOR JURY TRIAL ...................................................................................... 20

Plaintiffs Tiffany Wilson and Michael Brofman ("Plaintiffs") alleges the following claims for relief against Defendants Mastercard Inc. and Mastercard International Inc. (together referred to as "Mastercard" or "Defendants").

## **INTRODUCTION**

1.      Defendants Mastercard Inc. and Mastercard International Inc. are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through its electronic payments network, most commonly through Mastercard-branded credit cards, debit cards, and prepaid cards (collectively, "payment cards").

2.      Plaintiffs and members of the proposed Classes are Mastercard payment card cardholders in the U.S. who were issued Mastercard-branded payment cards, and used those cards to transact in foreign currencies.

3.      Mastercard does not issue payment cards directly to consumers. Instead, they provide financial institutions with Mastercard-branded payment products that the financial institutions then use to offer payment cards to their cardholders.

4.      Mastercard requires the banks that issue Mastercard-branded payment cards (the "member banks" or "issuing banks") to agree to be bound by certain rules of Mastercard (the "Mastercard Rules").[1] These Rules provide, *inter alia*, that the foreign exchange ("FX") rates applied to consumer payment card transactions in foreign currencies for each day will either be wholesale FX market rates or a government-mandated rate. The vast majority of jurisdictions do not have government-mandated rates.

---

[1] Available at https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf.

5.      The Mastercard Rules also state that the member banks should provide specific disclosures to member bank payment card cardholders describing what FX rates will be imposed.

6.      Member banks require all of their cardholders, including Plaintiffs and members of the proposed Classes, to agree to the terms of standardized credit card agreements and debit card agreements (together, the "Cardholder Agreements") as a condition of being issued a Mastercard-branded payment card.

7.      The member banks include language referencing the Mastercard Rules in their Cardholder Agreements, promising their cardholders, including Plaintiffs and Class Members, that the FX rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.[2]

8.      Contrary to the Mastercard Rules and the Cardholder Agreements, the FX rates applied to payment cardholder transactions do not represent rates available in the wholesale FX market.

9.      Further, even when the FX rates imposed by Mastercard are within the trading ranges of the individual currencies within the wholesale market for the applicable dates, the methods by which the rates are imposed are unfair, in bad faith, and therefore in violation of the Mastercard Rules and the Cardholder Agreements.

---

[2]  Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. Mastercard does not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, they adjust the rates to provide a profit for themselves. For all other currencies, the Mastercard Rules and the Cardholder Agreements provide that wholesale FX market rates must be applied.

10.     Based on the language of the Mastercard Rules regarding exchange rates—and the identical language set forth in the Cardholder Agreements—cardholders reasonably expect (and are led to believe) that the banks will charge wholesale rates that bear some resemblance to the rates that Mastercard and the banks themselves receive when transacting in foreign currencies to facilitate the cardholders' transactions. In fact, however, the banks and Mastercard rarely engage in wholesale market transactions to facilitate the cardholders' transactions, but when they do, they will charge and/or be charged genuine wholesale rates. Mastercard settles much of the transactions by U.S. cardholders with foreign merchants in U.S. Dollars, meaning neither the banks nor Mastercard engage in any currency conversion at all. In these instances, the need for any currency conversion at all is a pure fiction, and any hidden charge for the same, and/or the manipulation of FX rates in breach of the Mastercard Rules and the Cardholder Agreements, is unlawful and unjustly enriches Mastercard to the detriment of Mastercard cardholders. While the price the U.S. cardholder was quoted was in a foreign currency at the point of sale, the cardholder's account was in fact debited in U.S. Dollars, and the foreign merchant was typically paid in the foreign merchant's domestic currency.

11.     Even in transactions that Mastercard actually settles in foreign currencies, the need for currency exchange is minimal. Mastercard is engaged in multilateral global transactions on a massive scale (*i.e.*, doing multiple transactions in both directions—*e.g.*, U.S. Dollars to Euros, and Euros to U.S. Dollars). As a result of all these transactions, Mastercard is constantly in possession of large amounts of various currencies. Given its own currency balances, Mastercard only needs to engage in foreign currency transactions to settle any *net* currency settlement requirements.

12.     In sum, the FX rates Mastercard imposes and that banks charge cardholders for foreign transactions are largely a fiction and represent a non-transparent charge. They bear no

resemblance to any exchange rate obtained or which could be obtained by the banks or Mastercard in wholesale markets, as many times Mastercard exchanged no currency whatsoever (because the transaction was settled in U.S. Dollars or because Mastercard had foreign currency on hand to settle the transaction with the foreign merchant) or traded at spot or forward FX prices.

13.     Instead of approximating the issuing banks and Mastercard's actual costs of acquiring foreign currency to settle transactions, the rates Mastercard imposes and member banks charge consumers for FX transactions are designed to maximize profits for the banks and Mastercard. Specifically, the rates imposed vary based on the direction of the transaction, and are always in the banks' and Mastercard's favor. For example, for any given processing date, the rate imposed for converting U.S. Dollars to Euros will be significantly different from the inverse rate for converting Euros to U.S. Dollars. In both instances, it will be outside—or at the very high end of—the daily ranges of wholesale market rates for each currency conversion. This means that the cardholder will always get the worst rate and Mastercard will always get the best rate.

14.     Wholesale FX market participants make offers to purchase foreign currencies (referred to as a "bid" price), sell FX (the "ask price"), and the difference between the bid and the ask is called the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

15.     Because the rates imposed by Mastercard need not be contemporaneous (*i.e.*, from a bid-ask at a given point in time on the wholesale market), the spread between the two rates imposed by Mastercard for each currency pair (e.g., the spread between the rates for Euros to U.S. Dollars and for U.S. Dollars to Euros) exceeds the normal bid-ask spread by considerable margins, much greater than those at any given point in time on the markets themselves. In other words, Mastercard and banks are creating a fictional bid-ask spread (the highest rate in the day versus the

lowest rate in the day), and then manipulating the rate applied to Class Member transactions so that the members of the proposed Classes either always get the worst possible rate in either direction, or in fact are applied rates that are even outside of this fictional bid-ask spread, making it even worse for these consumers. This practice renders the promise of a rate from the wholesale markets illusory, as Mastercard is acting in a way no party to the contract would have reasonably expected—not to impose a bid-ask from the markets at any given point in time, but to impose a bid from one point in time, and an ask from an entirely different point in time—and then applying the worst possible rate for the cardholder in every case in both directions.

16.     This means that the FX rates imposed are excessively costly for cardholders and unreasonably profitable for the banks and Mastercard.

17.     Mastercard makes money on the difference between the rate it imposes on consumers to engage in the foreign transaction, and the rate (if any) Mastercard actually pays to acquire the foreign currency used to settle the transaction. When transactions are settled in the consumer's home currency (where no foreign currency is used at all), Mastercard's hidden manipulation of the FX rates charged to cardholders enables Mastercard to profit at the expense of cardholders. Because Mastercard also receives a percentage of the value of each transaction as a processing fee, it also benefits directly from inflated transaction amounts.

18.     Members of the proposed Classes transacted millions of dollars in foreign currencies with their Mastercard-branded payment cards during the relevant time period. Mastercard's illegal conduct has caused Plaintiffs and the Class Members to pay more for foreign transactions than they would have paid if Mastercard had complied in good faith with its contractual obligations to charge wholesale FX market rates rather than contrived rates. Class Members paid more because the FX rates were less favorable than those promised in the relevant

contracts (thereby diminishing Class Members' purchasing power) and also because Mastercard's conduct inflated the amount involved in each transaction, thereby causing Class Members to pay higher foreign transaction fees, which are usually charged as a percentage of the total transaction amount, and to pay more in credit card interest than they would have paid had to pay had the transaction value had not been improperly inflated.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Mastercard.

20.     The Court has personal jurisdiction over Mastercard because Mastercard's acts giving rise to Plaintiffs' claims took place, in substantial part, in New York generally and this District specifically. Mastercard has continuously and systematically transacted FX in this District and throughout the United States. Mastercard is headquartered in, maintains its principal place of business in, and maintains offices in Purchase, New York .

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Mastercard resides, transact business, is found, and has agents in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.     Defendants

22.     Defendants Mastercard Inc. and Mastercard International Inc. are Delaware corporations with their principal place of business in Purchase, New York.

**B.** **Plaintiffs**

23. Plaintiff Tiffany Wilson is an individual and a resident of Raeford, North Carolina. During the relevant time period, Ms. Wilson transacted in New Zealand Dollars ("NZD"), Peruvian Sol ("PEN"), and Chilean Pesos ("CLP"), with her Capital One issued Mastercard-branded credit card. In violation of the Mastercard Rules and Capital One's agreements with Ms. Wilson, Mastercard imposed rates for Ms. Wilson's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to in New Zealand Dollars ("NZD/USD"), U.S. Dollar to Peruvian Sol ("USD/PEN"), and U.S. Dollar to Chilean Pesos ("GBP/CLP") exchange rates. Mastercard imposed these rates not in good faith, but in an effort to maximize Mastercard's profits at Ms. Wilson's expense, in violation of the Mastercard Rules and Ms. Wilson's reasonable expectations that Mastercard would act in good faith in imposing exchange rates. The FX rates that Mastercard imposed on Ms. Wilson's transactions were more costly to Ms. Wilson than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Mastercard Rules and the Cardholder Agreement between Ms. Wilson and Capital One.

24. Plaintiff Michael Brofman is an individual and a resident of Denver, Colorado. During the relevant time period, Mr. Brofman engaged in at least one payment card transaction in Australian Dollars ("AUD") with his Capital One issued Mastercard-branded debit card. In violation of the Mastercard Rules and Capital One's agreements with Mr. Brofman, Mastercard imposed rates for Mr. Brofman's transaction(s) that was outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Australian Dollar ("USD/AUD") exchange rates. Mastercard

imposed these rates not in good faith, but in an effort to maximize Mastercard's profits at Mr. Brofman's expense, in violation of the Mastercard Rules and Mr. Brofman's reasonable expectations that Mastercard would act in good faith in imposing exchange rates. The FX rates that Mastercard imposed on Mr. Brofman were more costly to Mr. Brofman than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Mastercard Rules and the Cardholder Agreement between Mr. Brofman and Capital One.

## **FACTUAL ALLEGATIONS**

### **A.     Overview of the Payment Card Foreign Exchange Market**

25.     When a U.S. consumer makes a payment card transaction in U.S. Dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to Mastercard's electronics payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired. The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. Dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Mastercard sets default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

26.     When a U.S. consumer makes a payment card transaction in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited for the transaction in either its home currency or some other

agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, Mastercard performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is determined by Mastercard.

27.    The exchange rate used by Mastercard to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to Mastercard and Mastercard accepts that information.

28.    For many payment card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. Issuing banks generally charge foreign transaction fees ranging from 0% (*i.e.*, no foreign transaction fee) to 3%.

29.    Payment card contracts between consumers and issuing banks provide that conversion rates for foreign transactions will be determined by Mastercard pursuant to Mastercard's operating procedures. Mastercard's operating procedures for currency conversions are set forth in the Mastercard Rules.

30.    The largest participants in the wholesale FX market are dealer banks such as JPMorgan, Deutsche Bank, Citigroup, Barclays, UBS, and HSBC. Dealer banks trade foreign currency with each other and with other large financial institutions including Mastercard. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

31.     Mastercard also engages in foreign currency transactions with dealer banks. Mastercard engages in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations,[3] and to obtain currencies necessary to cover cardholders' foreign currency payment card transactions.

32.     However, Mastercard does not engage in parallel foreign currency transactions on the wholesale FX market for individual cardholder transactions, either on a per-transaction basis, or even on a daily basis.

33.     Instead, Mastercard maintains derivative contracts and reserves of currency and move funds between reserves as needed.[4]

34.     As one court found, Mastercard's foreign currency conversion costs are "minimal." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *43 (Cal. Super. Ct. Apr. 7, 2003).

35.     Because Mastercard generally settles foreign transactions in both directions for a given currency pair (*e.g.*, Mastercard has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), Mastercard is only required to "settle" the net amount of each given currency for each day. In other words, if Mastercard processed $1 billion in transactions from Euros to U.S. Dollars and the same amount from U.S. Dollars to Euros on a

---

[3] *See infra* n.11.
[4] "Through December 31, 2020, our approach to manage our transactional currency exposure consisted of hedging a portion of anticipated revenues impacted by transactional currencies by entering into foreign exchange derivative contracts, and recording the related changes in fair value in general and administrative expenses on the consolidated statement of operations. Beginning in January 2021, we started to formally designate certain newly-executed foreign exchange derivative contracts, which meet the established accounting criteria, as cash flow hedges." Mastercard Inc. Form 10-K for fiscal year ended December 31, 2020, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001141391/270dc0aa-fd4b-4ae7-90d3-6a086c010411.pdf.18

particular day, Mastercard would not need to engage in any actual FX transactions in the wholesale market on that day.

36.     Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (i.e., Euros), Mastercard settles the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars. Mastercard has no foreign exchange risk for these transactions. The idea that the consumer purchases in a foreign currency in such a transaction is a pure fiction.

37.     For all these reasons, the FX rates that Mastercard imposes on cardholders are not representative of the rates Mastercard actually pays for foreign currency. Nor are they reflective of any other costs associated with currency conversion that Mastercard bears. Instead, Mastercard and the banks are engaged in arbitrage: they set rates to maximize profits—and do so without regard to the terms of the contracts that they imposed on member banks and card members.

### B.     Applicable Contractual Provisions

38.     The contractual obligations between member banks and their payment card cardholders—including Plaintiffs and members of the proposed Classes—are set forth in each bank's Cardholder Agreements. The Cardholder Agreement is provided to credit card and debit card applicants who must accept the terms prior to the issuance of each payment card.

39.     Mastercard's relationships with the issuing banks are also governed by written agreements. These terms are memorialized in the Mastercard Rules.[5] Banks that issue Mastercard-branded payment cards to their cardholders are referred to in the Mastercard Rules as the "Issuers."

---

[5]             Mastercard             Rules             *available*             *at*, https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf

40.    The Mastercard Rules require member banks to include specific language in the member banks' Cardholder Agreements, and Mastercard "recommends and encourages" issuers explain how FX rates are determined for Mastercard payment card transactions. *See* Mastercard Rules at 125 (6.2 Issuer Responsibilities to Cardholders).

41.    Specifically the Mastercard Rules state:

> **Currency Conversion Procedure.** The [Mastercard] Corporation further recommends and encourages Issuers to inform their Cardholders that part of the Corporation's currency conversion procedure includes use of either a government-mandated exchange rate or a wholesale exchange rate, selected by the Corporation, and that the government-mandated exchange rate or wholesale exchange rate that the Corporation uses for a particular Transaction is the rate the Corporation selects for the applicable currency on date that the Transaction is processed (the Central Site Business Date), which may differ from the rate selected on the date the Transaction occurred or on the date the Transaction is posted to the Cardholder's Account.

*See* Mastercard Rules at 125.

42.    As discussed above, Mastercard mitigates foreign exchange risk by purchasing futures, and do not engage in daily trading to ensure its currency needs are satisfied.

**C.    Mastercard Imposed Inflated Foreign Exchange Rates in Violation of the Mastercard Rules**

43.    Mastercard's exchange rate practices with respect to Mastercard-branded cards violate the Mastercard Rules and the Cardholder Agreements.

44.    The exchange rates Mastercard imposes on credit card foreign transactions are not always "wholesale exchange rate[s]." Instead, Mastercard frequently imposes rates that are—for most currencies and on most dates—outside of the daily range of wholesale rates on the applicable processing date in a direction that is disadvantageous for the cardholders and advantageous for Mastercard and the member banks. This practice enables Mastercard and member banks to profit

from overcharging cardholders in violation of the Mastercard Rules and the Cardholder Agreements.

45.    An analysis of Mastercard's publicly available historical exchange rates that it has applied to foreign payment card transactions demonstrates that on a large portion of days and for many heavily traded currencies, Mastercard imposed exchange rates that were not in fact wholesale currency market rates.[6]

46.    For example, an analysis of the exchange rates applied by Mastercard to convert Euros to U.S. Dollars ("EUR/USD") to the band of rates available in the wholesale FX market for the corresponding dates for the period of October 2017 to September 2018 shows that the exchange rates Mastercard applied to convert cardholder transactions from Euros to U.S. Dollars were higher than the range of rates available in the wholesale market on 41 percent of the dates for the period of October 2017 to September 2018. Mastercard's rates were at least within the range of rates available in the wholesale FX market on only 59 percent of those dates.

47.    Discovery will show that Mastercard's method for determining its rates is largely algorithmic, and that Mastercard's pattern of generating profits for itself by applying rates that are higher than those promised in its contracts persisted throughout the relevant period, across currency pairs. Each such instance of Mastercard imposing rates outside the rates it promised in the Mastercard Rules and Cardholder Agreements injured Plaintiffs and Class Members and imposed an "overcharge."

48.    The extent of the overcharge for each Plaintiff and Class Member Mastercard card transaction can be calculated using transactional data in the possession, custody, or control of

---

[6] *See* Mastercard Currency Converter, https://www.mastercard.us/en-us/personal/get-support/convert-currency.html (*last accessed* July 2, 2021).

Mastercard and the member banks; historical Mastercard rates from Mastercard's website; and historical wholesale FX market data from third-party providers. Any transactions that were not subject to an overcharge—including transactions that took place on the limited number of dates for which Mastercard applied an exchange rate that was within the range of rates available in wholesale FX market—can be easily identified from those data sets and excluded.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs assert their claims on behalf of the following Nationwide Class:

**Nationwide Class:** All persons or entities with a Mastercard payment card who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Mastercard's executives and any Judge and judicial staff assigned to this case.

50.     This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

51.     Plaintiff Tiffany Wilson assert her claims on behalf of the following North Carolina Class:

**North Carolina Class:** All persons or entities with a Mastercard payment card residing in North Carolina who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Mastercard's executives and any Judge and judicial staff assigned to this case.

52.     Numerosity: The Classes are so numerous that joinder of all Class Members is impracticable.

53.     Typicality:  Plaintiffs' claims are typical of the Class Members' claims. Mastercard imposed FX rates on Plaintiffs in the same manner as other Class Members and did not vary its FX practices from consumer to consumer.

54. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes, have no known conflicts with other Class Members, and have retained counsel experienced in complex class action litigation.

55. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

a. Whether Mastercard breached its Mastercard Rules by charging exchange rates not authorized by the consumers' contracts;

b. Whether Mastercard was unjustly enriched by its conduct;

c. Whether Mastercard's practices were deceptive, unconscionable, or unfair; and

d. The proper measure of damages.

56. Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Mastercard has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

57. Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Mastercard's conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Mastercard, as the amount of each Class Member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Mastercard's practices. Moreover, management of this action

16

as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class Members' claims in a single forum.

58.    The running of any statute of limitations has been equitably tolled by reason of Mastercard's fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Mastercard actively concealed from Plaintiffs and Class Members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Mastercard's actual risk of exchanging foreign currencies. Discovery of Mastercard's illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

59.    As a result of Mastercard's actions, Plaintiffs and Class Members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Mastercard's acts and omissions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of All Plaintiffs and Proposed Nationwide Class)

60.    Plaintiffs incorporate each allegation above as if fully set forth herein.

61.    As alleged above, for the large majority of all cardholder transactions during the Class Period, the currency conversion rates imposed by Mastercard on cardholder foreign currency transactions were not selected from either wholesale FX market rates or a government-mandated rate as required by the Mastercard Rules and the Cardholder Agreements.

62.    As a result of Mastercard's exchange rate practices described herein, Mastercard has been unjustly enriched by overcharging cardholders for foreign currency transactions.

63.     Mastercard retained the amounts of those overcharges and, therefore, wrongfully obtained a legal benefit. Mastercard collected these amounts to the detriment of Plaintiffs and the Nationwide Class, and thus appreciated the benefit that in good conscience and equity Mastercard should not be entitled to retain.

64.     As a result, Mastercard has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class. Plaintiffs and the Nationwide Class therefore seek full disgorgement and restitution of the amounts Mastercard retained as a result of Mastercard's unlawful and/or wrongful conduct alleged herein.

**SECOND CLAIM FOR RELIEF**
**(On Behalf of Plaintiff Wilson and the North Carolina Class)**
**Violation of the North Carolina Unfair Trade Practices Act ("NCUTPA"), N.C. Gen. Stat.**
**§ 75-1 *et seq.***

65.     Plaintiff Wilson incorporates each allegation above as if fully set forth herein.

66.     Mastercard's conduct constitutes "unfair or deceptive acts or practices in or affecting commerce" in violation of N.C. Gen. Stat. § 75-1.1. This alleged conduct substantially affected commerce in the State of North Carolina and throughout the United States.

67.     Mastercard's conduct here was unfair and deceptive and was an inequitable assertion of its power. Mastercard imposed FX exchange rates for the sole purpose of maximizing Mastercard's and member banks' profits rather than being authorized by any contract or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language used in member bank Cardholder Agreements did not disclose Mastercard would impose rates beyond those allowed by the Agreements.

68.     Mastercard benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been

purchased on the FX futures market. Mastercard's conduct here was deceptive and Mastercard made false promises and concealed or omitted material facts. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Mastercard on foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff Wilson and members of the North Carolina Class were injured in the form of overcharges on FX payment card transactions.

69.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Wilson and members of the North Carolina Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

70.     As a result of Defendants' violations of the North Carolina Unfair Trade Practice Act, Plaintiff Wilson and members of the North Carolina Class seek treble damages, plus reasonable attorney's fees and court costs, pursuant to N.C. Gen. Stat. § 75-16.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, ask for judgment against Defendants as follows:

a.  Certification of this action as a class action on behalf of the proposed Classes;

b.  Designation of Plaintiffs as Class Representatives;

c.  Appointment of undersigned counsel as Class counsel;

d.  Judgment in favor of Plaintiffs on all causes of action;

e.  Declaration that the practices complained of herein are unlawful;

f.  Injunction requiring Mastercard to cease and desist from engaging in the unlawful practices alleged herein;

g.  Damages in the form of all money improperly collected or received by Mastercard;

h.  Disgorgement of all amounts improperly collected or received by Mastercard;

i.  An award of pre-judgment and post-judgment interest as provided by law;

j.  An award of attorneys' fees and costs; and

k.  Any further remedy the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Date: July 9, 2021

/s/ *Sharon K. Robertson*
Sharon K. Robertson
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10005
T. 212.838.7797
F. 212.838.7745

Eric L. Cramer*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.3009
F. 215.875.4604
ecramer@bm.net

E. Michelle Drake*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5933
F. 612.584.4470
emdrake@bm.net
**pro hac vice* forthcoming

*Counsel for Plaintiffs and the proposed Class*